UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

– v. –

ANTHONY MOLINA,

Defendant.

S1 19 Cr. 449 (NSR)

**THE GOVERNMENT'S OPPOSITION TO DEFENDANT ANTHONY MOLINA'S
MOTION FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Lindsey Keenan
Shiva Logarajah
Assistant United States Attorneys
 - *Of Counsel* -

# TABLE OF CONTENTS

I.    Preliminary Statement ..................................................................................... 1

II.   Background ...................................................................................................... 2

    A.    The Indictment ....................................................................................... 2

    B.    Status of Co-Conspirators ...................................................................... 2

    C.    The Government's Case .......................................................................... 3

    D.    The Defense Case ................................................................................. 14

    E.    The Defendant's Initial Rule 29 Motion .............................................. 16

    F.    The Jury's Verdict ................................................................................ 16

III.  This Court Should Deny Molina's Rule 29 Motion ...................................... 16

    A.    Applicable Law .................................................................................... 17

    B.    Discussion ............................................................................................ 18

        1.    There was Ample Evidence of the Defendant's Participation in the
             New Milford Robbery ................................................................ 19

        2.    Venue for the New Milford Robbery was Established by a
             Preponderance of the Evidence .................................................. 22

        3.    There was Ample Evidence to Support the Jury Verdict on the
             Firearms Offenses ..................................................................... 26

IV.   This Court Should Deny Molina's Rule 33 Motion ...................................... 28

V.    Conclusion .................................................................................................... 30

I.      **Preliminary Statement**

The Government respectfully submits this opposition to Anthony Molina's motion for a judgment of acquittal, under Federal Rule of Criminal Procedure Rule 29, and a for a new trial, under Federal Rule of Criminal Procedure Rule 33.

Molina was convicted at trial of two counts of conspiring to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Counts One and Four), two counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951 (Counts Two and Five), and two counts of brandishing a firearm in the course of the charged Hobbs Act robberies, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) and 2 (Counts Three and Six).  Over five days, a jury heard and saw overwhelming evidence that Molina participated in two brazen armed robberies of Verizon stores, the first in New Milford, Connecticut, on August 10, 2017 (the "New Milford Robbery"), and the second in Mahopac, New York, on February 15, 2019 (the "Mahopac Robbery").  In both robberies, co-conspirator Anthony Lauria served as the getaway driver in a dark-colored Honda Accord, while Molina and co-conspirator Brian Rodriguez entered the stores, terrorized store employees by displaying a firearm, restrained those same employees with zipties, and stole merchandise worth tens of thousands of dollars.

In his current motion (the "Motion"), Molina moves for (i) a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure Rule 29, on the basis that the evidence at trial was insufficient to sustain a conviction on any count, and insufficient to establish venue in the Southern District of New York with respect to Counts One, Two, and Three; and (ii) a new trial, pursuant to Federal Rule of Criminal Procedure Rule 33, on the same basis.  Because the evidence the Government presented was more than sufficient to sustain a conviction and establish venue in this District, the Motion should be denied.

## II.    Background

### A.    The Indictment

On December 18, 2020, a grand jury in this District returned a six-count superseding indictment S1 19 Cr. 449 (NSR) (the "Superseding Indictment"), which charged Molina, and co-conspirators Anthony Lauria and Brian Rodriguez, with participating in a conspiracy to commit Hobbs Act robbery, and substantive Hobbs Act robbery, in connection with the New Milford Robbery, in violation of 18 U.S.C. § 1951, and using a firearm that was brandished during the course of the New Milford Robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2; and with participating in a conspiracy to commit Hobbs Act robbery, and substantive Hobbs Act robbery, in connection with the Mahopac Robbery, in violation of 18 U.S.C. § 1951, and using a firearm that was brandished during the course of the Mahopac Robbery, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(c) and 2.

### B.    Status of Co-Conspirators

On April 1, 2021, Rodriguez pleaded guilty to a two-count superseding Information charging him with participating in a conspiracy to commit Hobbs Act robbery, wire fraud, and interstate transportation of stolen goods, in violation of 18 U.S.C. § 371, and using a firearm that was brandished during the course of the Mahopac Robbery, and aiding and abetting the same, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) and 2.  On July 16, 2021, Rodriguez was sentenced to 132 months' imprisonment.

On June 4, 2021, Lauria pleaded guilty to Counts One, Two, Four, and Five of the Superseding Indictment. He is scheduled to proceed to trial on Counts Three and Six of the Superseding Indictment on February 28, 2022.

### C.     The Government's Case

Jury selection commenced on June 14, 2021, and the Court heard opening statements on June 15, 2021.  The Government presented evidence in reverse chronological order, beginning with the Mahopac Robbery.

The Mahopac Robbery

The Government's first witness was Christopher Sielawa, an employee of the Verizon store in Mahopac, New York (the "Mahopac Store").  (Tr. 33).  Mr. Sielawa was working in the Mahopac Store in his capacity as a sales consultant on the date of the Mahopac Robbery.  (Tr. 34).  At that time, the Verizon store sold products that were manufactured outside of New York State.  (*Id.*).  On February 15, 2019, Mr. Sielawa was preparing to close the Mahopac Store, when a man carrying a "hand pistol" came through the main door.  (Tr. 35).

Mr. Sielawa viewed surveillance footage from the Mahopac Store in advance of his testimony (Tr. 36), and the jury witnessed the Mahopac Robbery through the surveillance footage, which Mr. Sielawa narrated.  (Tr. 36-46; GX-104-A to GX-104-I).  Mr. Sielawa identified himself sitting on a sofa in the Mahopac Store, and stated that moments later there was a "gun in [his] face."  (Tr. 38).  As the surveillance video proceeded, Mr. Sielawa identified himself face down on the floor, while one of the robbers bound Mr. Sielawa's hands with zip ties, and emptied his pockets.  (Tr. 38-39).  Mr. Sielawa testified that he felt the robber's bare skin on his hands as the robber tied him up.  (Tr. 39).

Mr. Sielawa stated that he provided pin codes to the merchandise safes in the Mahopac Store because he "feared for [his] life."  (Tr. 41).  In the surveillance video, Mr. Sielawa kneels on the floor with his arms bound behind his back while two individuals remove merchandise from the

safes. (Tr. 42-43). As the robbers pillaged the store, Mr. Sielawa heard them speaking Spanish, and heard one robber say the name "Brian." (Tr. 43). Mr. Sielawa looked at one of the robbers, who then threatened to pistol whip him. (Tr. 44). At the conclusion of the robbery, Mr. Sielawa was directed to crawl into the bathroom and count to sixty. (Tr. 45-46). He was "terrified" and instead counted to one hundred and twenty before he broke free of the zip ties, left the bathroom, and called the police, his mother, and the Mahopac Store manager. (Tr. 46-47).

The Government's next witness was Investigator Robert Tichy, from the Putnam County Sheriff's Office, who responded to the scene of the Mahopac Robbery on the evening of February 15, 2019. (Tr. 56-57). Investigator Tichy photographed and videotaped the scene, and collected evidence. The evidence he collected included a zip tie recovered from the bathroom floor of the Mahopac Store, and a zip tie recovered from Mr. Sielawa's right wrist. (Tr. 58-61, 65; GX 102-A, 102-B). The jury saw the aftermath of the Mahopac Robbery through photographs and video taken by Investigator Tichy, including a cabinet at the front of the store from which it appeared electronics were removed, and an empty safe in the back room. (Tr. 61-64; GX 105-A, 105-B, 101-A to 101-L).

The Government next called Sergeant Michael Russo, from the Carmel Police Department. (Tr. 69). Sergeant Russo responded to the Mahopac Store after the robbery was reported. (Tr. 72). At the Mahopac Store, Sergeant Russo spoke with Mr. Sielawa, and collected evidence that he transported to the New York State Police evidence hub at Stewart Airport. (Tr. 73). In addition, Sergeant Russo personally collected surveillance video from the Mahopac Store and an adjoining business, Skyline Towing. (Tr. 73-75; GX 103). In watching the video from the Mahopac store, he observed that the time on the recording was eighteen minutes ahead of real time. (Tr. 73-74).

In watching the video from Skyline Towing, Sergeant Russo observed what appeared to be a black Honda, driven by a third suspect, the getaway driver, waiting outside during the robbery.  (Tr. 76).

Sergeant Russo testified that he carries a Glock 23 on duty, and receives firearms training three times per year (Tr. 71).  Sergeant Russo reviewed a portion of surveillance video (GX 104-H), and identified one of the robbers holding what appeared to be a "black pistol" in his right hand. (Tr. 76).  While holding the pistol, the robber used his left hand to "push[] something into the magazine well of the gun," a gesture Sergeant Russo testified was "consistent with loading the firearm."  (Tr. 77).  In another portion of surveillance video from the Mahopac Store, one of the robbers "attempt[ed] to disable the security surveillance system" by "pulling the wires."  (Tr. 77).

Sergeant Thomas Marello, from the Yonkers Police Department, followed Sergeant Russo. He testified that on April 27, 2019, he was conducting surveillance of Molina, with the aim of identifying Molina's telephone number.  (Tr. 81).  Sergeant Marello saw Molina pull into a residential address on Park Avenue in Yonkers, New York (the "Park Avenue Address"), while driving a white Mercedes-Benz bearing New York registration ending in 6846 (the "Mercedes). (Tr. 81-82).  Upon seeing Molina, Sergeant Marello instructed his partner, who was in a separate car, to call Molina's suspected phone number, ending in 2454 (the "Molina Phone"). (Tr. 82, 86). When Sergeant Marello's partner made the call, Sergeant Marello watched as Molina looked at his phone then put it to his ear, and Sergeant Marello heard Molina say "hello." (Tr. 82).  Sergeant Marello identified Molina in the courtroom as the individual he saw answer the Molina Phone on April 27, 2019.  (Tr. 91).

The parties stipulated to numerous facts.  After Sergeant Marello's testimony, the jury heard a stipulation that between February 27, 2017, and December 30, 2019, a black Honda Accord

was registered to Kevin Lauria, at an address on Sherwood Lane, in Yonkers, New York, and that between May 11, 2016, and June 25, 2019, the Mercedes was registered to Simon Transmission & General Mechanic Corp.  (Tr. 96; GX 1005).  The parties also stipulated that Fabiola Molina was the principal executive officer of Simon Transmission & General Mechanic Corp., and the registered agent for a business called ASA Cornerstone.  (Tr. 97-98; GX 1006).  The parties further stipulated that on the date of Molina's arrest, he told the United States Marshal's Service that Fabiola Molina was his mother, Stephanie Molina was his sister, and they resided together at the Park Avenue Address.  (Tr. 98; GX 1013).

The Government's next witness, Lisa Sheridan, a forensic scientist for the New York State Police, was qualified as an expert in DNA analysis.  (Tr. 105).  Ms. Sheridan testified that she performed DNA analysis on the zip tie collected from Mr. Sielawa's wrist at the scene of the Mahopac Robbery.  (Tr. 114; GX 152).  The DNA recovered from the zip tie was a mixture profile, with three contributors including Mr. Sielawa.  (Tr. 114-116, 119).  Ms. Sheridan compared the DNA from the zip tie to a DNA sample obtained from Molina, and determined that Molina could be included as a possible contributor to the mixture profile.  (Tr. 120-122; GX 1004).  Ms. Sheridan presented a table summarizing her findings, which reflected that for each of the sixteen DNA loci for which she was able to make a comparison, Molina shared alleles with the mixture profile from the zip tie.  (Tr. 122-127; GX 158).  Ms. Sheridan concluded that "the probability of selecting an unrelated individual with a profile that could be included in this mixture" was "1 in 39.98 million." (Tr. 128; GX 153).

In addition to the stipulations described above, the parties stipulated to facts related to certain phone numbers.  First, that law enforcement officers used geolocation information for a

cellphone assigned a call number ending in 3972 (the "Lauria Phone") to locate Anthony Lauria on the date of his arrest, that Lauria was arrested at an address on Sherwood Avenue, in Yonkers, New York, and the Lauria Phone was seized at the time of Lauria's arrest. (Tr. 143; GX 1002). Likewise, law enforcement officers used geolocation information for a cellphone assigned a call number ending in 1912 (the "Rodriguez Phone"), to locate Brian Rodriguez on the date of his arrest, that Rodriguez was arrested at an address on Alexander Avenue, in Yonkers, New York, and the Rodriguez Phone was seized at the time of Rodriguez's arrest.  (*Id*.).  Further, law enforcement officers used geolocation information for the Molina Phone to locate Anthony Molina on the date of his arrest, and Molina was arrested at the Park Avenue Address.  (Tr. 144; GX 1002).

Subscriber records, historical location records, and call records for the Lauria Phone, the Rodriguez Phone, and the Molina Phone were also admitted by stipulation. (Tr. 144-150; GX 300-GX 324, GX 330-350, 360-374, GX 1003, GX 1008, GX 1009).  In addition, subscriber records, call records and information provided by Verizon regarding the city and state of cell towers used by a fourth phone, assigned a call number ending in 4879 (the "2017 Molina Phone") were admitted by stipulation.  (Tr. 150-152; GX 380-389, GX 1010).  The Molina Phone was subscribed to in the name of ASA Cornerstone, and the 2017 Molina Phone was subscribed to in the name of "Jonathan Rivera."  (Tr 342; GX 380).

The New Milford Robbery

The Government's next witness was Marcelino Wright, an employee of Cellular Sales Corporation, which is a proprietary Verizon retailer.  (Tr. 201). Cellular Sales sells products made by Samsung, Motorola, LG, and Apple.  (Tr. 201). Some of the Apple products sold by Cellular Sales are manufactured in China.  (Tr. 201).

Mr. Wright was working at the Cellular Sales branch in New Milford, Connecticut, on the date of the New Milford Robbery, as was his colleague Troy Consalvo.  (Tr. 201).  Mr. Wright reviewed surveillance video from the New Milford Store in advance of testifying, and the jury saw the New Milford Robbery through the video.  (Tr. 202-203; GX 202-215).  As corroborated by the surveillance video, at 7:23 p.m., Mr. Wright assisted a customer who was interested in looking at the Apple iPhone 7.  (Tr. 204).  When the customer left the store, he turned left and walked toward a black sedan waiting in the parking lot.  (Tr. 204).

Minutes after the customer left the store, the first robber entered, wearing a mask and brandishing a gun.  (Tr. 205-206).  Mr. Wright testified that it "was like a surreal moment" and he was "scared, because having a gun pointed at you . . . you're not sure . . . what's going to happen." (Tr. 206).  Mr. Wright put his hands in the air when the first robber came through the door of the New Milford store, and moments later the second robber entered.  (Tr. 207).  Mr. Wright showed the robbers to the "IC room," where the smartphones and tablets were stored.   (Tr. 207). Surveillance video from inside the IC room showed the second robber loading iPads into a duffel bag, then tying Mr. Wright's hands with zip ties.  (Tr. 208-209).  The other Cellular Sales employee, Mr. Consalvo, and the first robber then entered the IC room.Mr. Wright testified that the robber threatened to hurt him if "he doesn't get his way."  (Tr. 208-209).  After the robbers loaded their bags with merchandise they left.  (Tr. 209).  Mr. Wright and Mr. Consalvo waited in the IC room for approximately three or four minutes, then called the police.  (Tr. 210).

William John Stevens, the regional director of the New York Metro market for Cellular Sales Corporation, testified next.  (Tr. 213-214).  Mr. Stevens testified that 20 stores fall within his managerial purview, and as of August 2017, the New Milford Store was one of them.  (Tr.

214).  At that time, the New Milford Store sold a variety of cellular devices, including Apple products manufactured in China.  (Tr. 214-215).

As a regular part of its business, Cellular Sales maintains a database of customer records, including customers' names, addresses, phone numbers, and purchase history.  (Tr. 215).  Records for the New Milford Store from the August 2017 time period reflected that numerous customers of the New Milford store were residents of the Southern District of New York, including in Dutchess and Putnam Counties.  (Tr. 215-217; GX 230).  At that time, Cellular Sales grouped the New Milford Store into its Westchester submarket, which also included stores in Putnam and Westchester Counties.  (Tr. 218).  The New Milford Store shared a sales manager, an operations manager, sales representatives, and inventory with the other stores in the Cellular Sales Westchester submarket.  (Tr. 218).   According to Mr. Stevens, the Apple iPhones and iPads stolen during the New Milford Robbery were valued at approximately $48,000.  (Tr. 219-220).

Detective Robert Guilbeault from the New Milford Police Department investigated the New Milford Robbery.  (Tr. 221).   Detective Guilbeault testified to his observations of the surveillance video of the New Milford robbery, including that when the customer Mr. Wright helped at approximately 7:23 p.m. left the store, he was "definitely looking around," and "checking to see if anybody else might be in the store."  (Tr. 226-227).  After watching the video, Detective Guilbeault thought there was "good potential" to find a fingerprint on the glass entry door of the store, because he could see exactly where the customer touched it.  (Tr. 227-228).

Detective Guilbeault testified that after the customer left, a robber entered the store carrying a firearm in his right hand, which he pointed at Mr. Wright and Mr. Consalvo.  (Tr. 229-230).  After directing Mr. Consalvo to get on the floor, the robber appeared to "kneel down in front

9

of him and rack or cock the firearm," which is "taking a round or bullet from the magazine, putting into the chamber so the gun would be ready to fire." (Tr. 231). In the IC room, the robber approached the surveillance system, and powered it off. (Tr. 233). Detective Guilbeault also testified about the investigative steps he took in the New Milford Store, which included photographing and lifting a thumb print from the door, and photographing the scene. (Tr. 233-236; GX 250, GX 251, GX 201-A to GX 201-N).

Later, Detective Guilbeault began to focus his investigation on Anthony Lauria. (Tr. 239). The parties stipulated that Lauria provided his fingerprints to the New York State Licensing Division in connection with his application for employment as a security guard (Tr. 240-241, GX 900, GX 1007), and that the fingerprint Detective Guilbeault lifted from the New Milford Store was identified by a forensic analyst to Anthony Lauria's right thumbprint. (Tr. 241-243; GX 1011).

Investigator Matthew Tunney, a Task Force Officer from the Federal Bureau of Investigation (the "FBI") Safe Streets Task Force testified about digital evidence from the Rodriguez Phone, and from Apple iClouds maintained by Anthony Lauria and Anthony Molina. (Tr. 261-262). The digital evidence was admitted by stipulation,[1] and presented to the jury in a summary chart. (Tr. 261-262; GX 1520).

---

[1] Records from Apple iCloud accounts registered to Lauria, Molina, and Brian Rodriguez were admitted by stipulation, as were the contact list and location history from a navigation application on the Rodriguez Phone. (Tr. 253-258; GX 401, GX 501, GX 502-A, GX 502-B, GX 502-C, GX 502-D, GX 502-E, GX 503-A, GX 503-C, GX 505-A, GX 505-B, GX 506-A, GX 507-A, GX 507-D, GX 507-E, GX 507-F, GX 512, GX 512-A, GX 518, GX 518-A, GX 514, GX 514-A, GX 522, GX 522-A, GX 524, GX 524-A, GX 529, GX 529-A, GX 527, GX 530, GX 530-A, GX 532, GX 532-A, GX 516, GX 516-A, GX 510, GX 510-A, GX 533, GX 533-A, GX 534, GX 534-A, GX

Rodriguez stored multiple contact numbers in his phone under the variations of the contact name "Molina," including the number assigned to the Molina Phone, which was stored as "Molina Nunuu," and the number assigned to the 2017 Molina Phone, which was stored as "Molina 4." (Tr. 265-266).   In addition, the location history from the Waze navigation application on Rodriguez's phone included a search for the address of the Mahopac Store on February 13, 2019, two days before the Mahopac robbery occurred.  (Tr. 277-278).

Molina's Apple iCloud included:

- Photographs of firearms and ammunition, including photographs of black handguns that were stored in the months preceding the Mahopac Robbery. (Tr. 266, 268, 269, 271).

- Geolocation information for some of the photographs of handguns demonstrating the photographs were taken in the vicinity of the Park Avenue Address. (Tr. 272).

- A video of Molina driving a car while waving a silver handgun.  (Tr. 273).

- Notes about the prices for various Apple products, including different iPhone models. (Tr. 267, 271, 279).

- Personal identifying information for "Jonathan Rivera." (Tr. 267).

- Photographs of numerous packaged Apple iPhones. (Tr. 268, 273).

- A text message sent by Molina on November 28, 2018, about purchasing a "9" and "explosive bullets."  (Tr. 270-271).

- Photographs of the Mahopac Store, its address, location on a map, and business hours. (Tr. 274).

---

535, GX 535-A, GX 536, GX 536-A, GX 537, GX 537-A, GX 538, GX 538-A, GX 511, GX 511-A, GX 539, GX 539-A, GX 540, GX 540-A, GX 404, GX 405, GX 405-A, GX 541, GX 541-A, GX 542, GX 542-A, GX 1001, GX 802, GX 803, GX 1012).

- A text message exchange between Lauria and Molina three days prior to the Mahopac Robbery, about a plan for which three people was "perfect".  (Tr. 276-277).

- A text message exchange between Lauria and Molina the day after the Mahopac Robbery, in which Lauria sent a photograph of two handguns, and Molina responded, "You like the one on the right or the one we had today?"  (Tr. 280).

- A text message exchange between Lauria, Rodriguez, and Molina, which shared an internet search for a news article entitled "New Milford Police investigating armed robbery."  (Tr. 281-283).

- Internet search history for "aggravated robbery" and "aggravated robbery in CT."  (Tr. 287-288).

- A text message between Molina and a contact saved as "Moe Phones" from the day after the Mahopac Robbery, in which Molina indicated he had various cellphone models, stating, "everything Verizon." (Tr. 289-290).

- A text message between Molina and a contact saved as "Steph" from the day after the Mahopac Robbery, in which Molina stated he was "in the middle of Fordham with $20,000 in [his] pocket." (Tr. 288).

Following the presentation of digital evidence, Amanda Pinero, a staff operations specialist from the FBI, testified about call record analysis she performed.  (Tr. 293-294; GX 1510).  Ms. Pinero testified that Anthony Lauria was the subscriber to the Lauria Phone, Brian Rodriguez was the user of the Rodriguez Phone, and that she attributed the Molina Phone to Anthony Molina, based on Sergeant Marello's testimony.  (Tr. 295-296).  The Lauria Phone, the Rodriguez Phone, and the 2017 Molina Phone had numerous contacts on August 10, 2017.  (Tr. 298).  Likewise, the Lauria Phone, the Rodriguez Phone, and the Molina Phone had numerous contacts on February 15, 2019.  (Tr. 299).  Ms. Pinero conducted common call analysis in which she compared calls made and received by the 2017 Molina Phone to calls made and received by the Molina Phone. (Tr. 300-302).  In the weeks before and after each robbery, both the 2017 Molina Phone and the Molina Phone had numerous contacts with phone numbers stored in Molina's iCloud as "Steph,"

"Dad," and "Fabiola Molina," in addition to contacts with the Lauria Phone and the Rodriguez Phone. (Tr. 301-304). Based on the common calls, it was "highly likely the same individual" was using both the 2017 Molina Phone and the Molina Phone. (Tr. 304).

The Government's final witness was Special Agent Michael Sabric, a member of the FBI cellular analysis survey team. (Tr. 323-324). Agent Sabric was qualified as an expert in the analysis of cell site records and cell site technology. (Tr. 327). Agent Sabric testified about analysis he performed regarding the cell site locations of the Molina Phone, the Lauria Phone, and the Rodriguez Phone on the date of the Mahopac Robbery, and the cell site locations of the Lauria Phone and Rodriguez Phone on the date of the New Milford Robbery, as well as the originating and destination city and state of the cell sites used by the 2017 Molina Phone on the date of the New Milford Robbery. (Tr. 337; GX 1530). On the date of the Mahopac Robbery, the Rodriguez Phone, the Lauria Phone, and the Molina Phone each traveled to the area of Mahopac, New York, before the time of the Mahopac Robbery, and back to the area of Yonkers, New York, after the time of the Mahopac Robbery. (Tr. 358, 361, 363). On the date of the New Milford Robbery, the Rodriguez Phone, the Lauria Phone, and the 2017 Molina Phone all traveled from the area of Yonkers, New York, to the area of New Milford, Connecticut, before the time of the New Milford Robbery, and back south again, after the time of the New Milford Robbery. (Tr. 346, 349, 353).

Finally, the parties stipulated to the Spanish / English translation of a text message saved in Molina's Apple iCloud (GX 537), from the date of the Mahopac Robbery, which stated:

> But so far they're not good.
> Today I was able to send a phone it arrives tomorrow.
> I didn't send more because I was at work and there you have to send them early so that they arrive the next day.
> How much do you get paid for the Verizon XS64?"

(Tr. 385; GX 1014).

### D.    The Defense Case

The defendant vigorously cross-examined Government witnesses, called one witness, and testified in his own defense.

The defendant first called Troy Consalvo, who was working at the New Milford Store on the date of the New Milford Robbery. (Tr. 388). Mr. Consalvo was working at his desk when "someone came into the store," "pulled guns," and "directed [him] to get down on the ground." (Tr. 389). The man "cocked the gun," and it "sounded plastic" but Mr. Consalvo "wasn't willing to take any chances." (Tr. 389). He "put [his] hands up and got down on the ground." (Tr. 390).

Next, the defendant testified, and admitted to carrying guns because he had been kidnapped but denied partaking in either of the robberies. (Tr. 429). According to the defendant, on August 29, 2017, he was "kidnapped" by individuals known to him as Gustavo and Frankie Vasquez. (Tr. 431). The Vasquezs held the defendant for approximately two hours, and interrogated him about who "looted" their car. (Tr. 432). The defendant was pistol-whipped and beaten during the ordeal, and hospitalized for his injuries afterward. (Tr. 432-434). After the kidnapping, the defendant possessed and displayed firearms because he was "never going to let that shit happen again." (Tr. 435). On December 19, 2019, the defendant posted a video to social media that depicted him waving a gun around inside his car, "to show that [he] was armed" and there would be "potential conflict" if the Vasquez brothers were "waiting" for him. (Tr. 435-436). The defendant offered two photographs from his Snapchat account, which depicted a firearm in his gym bag. (Tr. 437-439; DX D, F). He explained the image was posted to Snapchat on November 10, 2017, and it was his "first gun post ever." (Tr. 439).

14

The defendant testified he kept photographs of Apple products and price lists for iPhones on his iCloud because he and a group of fifteen to twenty other people performed identity theft, and used stolen personal information to fraudulently buy cellphones at cellphone stores. (Tr. 440-442). The defendant was "known by a lot of people to be quite good at identity theft." (Tr. 442).

On cross-examination, the defendant acknowledged he "had a real gun in the fall of 2017" (Tr. 445), and the firearms depicted in Defense Exhibit F, and Government Exhibits 510, 512, and 532, were all real firearms that he possessed at one time or another. (Tr. 445-447). The defendant reviewed a text message from November 28, 2018 (GX 502-C), and identified his requests for a "9 man brunch" and "food for a .38" as being requests for a 9 millimeter firearm and .38 caliber ammunition. (Tr. 447-438).

With respect to the Mahopac Robbery, the defendant stated he knew his DNA was on one of the zip ties recovered from the scene. (Tr. 454). In addition, the defendant confirmed that in February 2019, he used the Molina Phone (Tr. 452), which was in Mahopac on the date of the Mahopac robbery. (Tr. 454). The defendant said it was "very troubling" that the Molina Phone, the Lauria Phone, and the Rodriguez phone were all in Mahopac at the time of the Mahopac Robbery. (Tr. 455).

With respect to the New Milford Robbery, the defendant acknowledged he used the 2017 Molina Phone during August 2017, but insisted his friend "Omar" had the phone between 3:00 p.m. and 9:30 p.m. on the date of the New Milford Robbery. (Tr. 461-462).

The defendant testified he saw the surveillance video of the New Milford Robbery and the Mahopac Robbery during the trial, and he was not in those videos. (Tr. 430-431).

15

### E.    The Defendant's Initial Rule 29 Motion

At the close of the Government's case, defense counsel moved for a new trial, pursuant to Rule 29(a), based upon "insufficient evidence." (Tr. 374). Defense counsel argued there was a "lack of any substantive evidence [to] support" Counts One, Two, and Three of the Superseding Indictment. (Tr. 374). Defense counsel further argued there was a lack of venue as to the same Counts, based on an "insufficient nexus" to the Southern District of New York. (Tr. 375).

The Court first found the Government met its burden with respect to venue (Tr. 376), then summarized the Government's evidence as follows: "you have similar MO, modus operandi . . . you have individuals of similar build entering the locations and you put that together with the text messaging, the cellphone locations and so forth, and that all ties the defendant to both robberies." (Tr. 379). The Court ordered, "I'm going to deny your application at this time." (Tr. 379).

### F.    The Jury's Verdict

After approximately four hours of deliberation, the jury returned a unanimous verdict finding the defendant guilty of all counts in the Superseding Indictment, and further finding that with respect to Counts Three and Six, a firearm was brandished. (Tr. 579-583).

## III.    This Court Should Deny Molina's Rule 29 Motion

The defendant argues a judgment of acquittal is necessary because there was (i) no "substantive evidence or testimony" connecting him to the New Milford Robbery (Mot. at 5); (ii) "meager" evidence of venue for the New Milford Robbery (Mot. at 7); and (iii) insufficient proof that the firearms used in the robberies were "actual firearms." (Mot. at 12). Because the evidence as to these issues was more than sufficient, the Motion should be denied.

A.    **Applicable Law**

The standard on a Rule 29 motion for acquittal is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence must be viewed "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) (internal quotation marks omitted). In assessing the sufficiency of the evidence, a reviewing court must analyze the pieces of evidence "in conjunction, not in isolation," *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999). The Court must "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 136-37 (2d Cir. 2006) (internal quotation marks omitted), because "the task of reviewing among competing, permissible inferences is for the [jury], not for the court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Accordingly, where there are competing inferences, the Court must defer "to the jury's choice." *United States v. Morrison*, 153 F.3d 34, 49 (2d Cir. 1998). Notably, "the government's evidence need not exclude every other possible hypothesis." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citations omitted). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105 (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)).

With respect to a conspiracy conviction, these deferential standards are "especially important … because a conspiracy by its very nature is a secretive operation, and it is a rare case

17

where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (internal quotation marks omitted); *accord, e.g., United States v. Rojas*, 617 F.3d 669, 674 (2d Cir. 2010). "[E]ven the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face or does not def[y] physical realities." *United States v. Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation marks and citation omitted). As with the other elements of a conspiracy, "a defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence." *United States v. Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993). A "court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted). Accordingly, "[a] defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

### B.    Discussion

Weighing all issues of credibility and crediting every inference in favor of the Government, there was ample evidence for a rational trier of fact to find the essential elements of the crimes charged beyond a reasonable doubt. *Guadagna*, 183 F.3d at 130.

To prove Molina guilty of participating in a conspiracy to commit robbery, as charged in Counts One and Four, the Government had to prove (i) there existed a conspiracy to commit robbery; and (ii) Molina knowingly and intentionally joined the conspiracy. To prove Molina guilty of Hobbs Act robbery, as charged in Counts Two and Five, the Government had to prove (i) Molina took the personal property of another, or aided and abetted the same; (ii) the property was

taken against the victim's will by actual or threatened force; (iii) Molina's actions obstructed, delayed, or affected interstate commerce; and (iv) Molina acted unlawfully and knowingly.  To prove Molina guilty of the firearms offenses charged in Counts Three and Six, the Government had to prove (i) the defendant used or carried or possessed a firearm, or aided and abetted the same; (ii) the firearm was used or possessed during and in relation to a specified crime of violence; and (iii) the defendant acted willfully and knowingly.

### 1.    There was Ample Evidence of the Defendant's Participation in the New Milford Robbery

The evidence presented to the jury regarding Molina's participation in the New Milford Robbery was ample, and certainly far more than sufficient to sustain the jury's verdict. *Persico*, 645 F.3d at 104 ("The test for sufficiency is whether … a 'rational trier of fact could have found the defendant guilty beyond a reasonable doubt.'" (quoting *Jackson*, 335 F.3d at 180)).

As described extensively above, the Government offered a multitude of evidence to establish that the New Milford Robbery and the Mahopac Robbery were committed by the same crew.  The robbery victims testified that shortly before closing time at their respective Verizon stores, two men came in and robbed them.  (Tr. 35, 204-206).  The victims testified that the first man through the door brandished a gun, that they were restrained with zip ties, brought to the back room, and forced to standby while the inventory of Apple products was looted.  (Tr. 38-47; 205-210).  Law enforcement witnesses testified that a black sedan driven by the getaway driver waited outside for the duration of each robbery, and that before leaving the stores the robbers attempted to disable the surveillance systems.  (Tr. 76-77, 228, 233). Surveillance video from the New Milford Store clearly depicted Anthony Lauria entering the store in advance of the robbery, then walking toward a black sedan waiting in the parking lot.  (GX 204, GX 214).  Surveillance video

from each store depicted individuals of similar build entering the stores to commit the robberies. (GX 104-A, GX 104-B; GX 208). During each robbery, the first robber to enter the store wore a mask and brandished a gun, and the second robber wore a cap, sunglasses, and gloves, and carried a bag. (GX 104-A, GX 104-B, GX 208).

The Government also offered forensic evidence linking the defendant and his crew to each robbery. Testimony from Detective Guilbeault established that minutes before the New Milford Robbery, the crew's lookout left a fingerprint on the glass entry door to the New Milford Store. (Tr. 227-228, 233-234). Detective Guilbeault photographed the print, and lifted it with magnetic powder. (Tr. 235; GX 250, GX 251). The parties stipulated that a forensic analyst compared the photograph of the lifted print to Anthony Lauria's known fingerprint, on file with New York State, and identified the lifted print to Anthony Lauria's right thumbprint. (Tr. 240-241; GX 900, GX 1007). Testimony from Investigator Tichy established that a zip tie was recovered from Christopher Sielawa's right wrist following the Mahopac Robbery. (Tr. 58-59; GX 102-B). Sergeant Russo testified that he transported the zip tie to the New York State Police Lab. (Tr. 73). Forensic Scientist Sheridan analyzed DNA found on the zip tie, and compared it to Molina's DNA. Molina's DNA was present at every location suitable for analysis. (Tr. 127).

In addition, the Government offered cellphone evidence, in the form of subscriber records, call records, and cell site location records, showing that three cellphones, the 2017 Molina Phone, the Lauria Phone, and the Rodriguez Phone, were in contact on the date of the New Milford Robbery, and traveled at approximately the same time from Westchester, to New Milford, and then back to Yonkers again. (GX 300-GX 324, GX 330-GX 350, GX 380-GX 399, GX 1003 GX 1008, GX 1010, GX 1530). Molina was tightly connected to the 2017 Molina Phone by the evidence

presented at trial. Not only was the call number assigned to that phone stored in Rodriguez's cellphone contacts as "Molina 4" (GX 802), but the phone was used during the month of August 2017 to contact Molina's mother, father, and sister, as well as Lauria and Rodriguez. (GX 301-303). It was also subscribed to in the name of "Jonathan Rivera," whose personal identifying information Molina stored in his iCloud. (GX 380; GX 514). Finally, Molina acknowledged on cross examination that during August 2017, he used the 2017 Molina Phone. (Tr. 461-462).

Similar evidence—subscriber records, call records, and cell site location records—showed that three cellphones, the Molina Phone, the Lauria Phone, and the Rodriguez Phone, were in contact on the date of the Mahopac Robbery, and traveled at approximately the same time from Yonkers, to Mahopac, and then back to Yonkers again. (GX 300-GX 324, GX 330-GX 350, GX 360-GX 370, GX 1003 GX 1008, GX 1009, GX 1530). Molina was connected to the Molina Phone by law enforcement testimony that he answered a call to that phone number on April 27, 2019 (Tr. 81-82), and by a stipulation that law enforcement officers used geolocation information for that phone number to locate and arrest Molina. (GX 1002). In addition, the Molina Phone was subscribed to in the name of a business registered by Molina's mother, ASA Cornerstone (GX 1006), linked to Molina's iCloud account (GX 505-A, GX 505-B), and stored in Rodriguez's cellphone contacts as "Molina Nunuu" (GX 802). Further, Molina acknowledged on cross examination that in February 2019, he used the Molina Phone. (Tr. 452).

The digital evidence presented at trial provided the jury insight into Molina's consciousness of guilt. It established that Molina conducted internet searches about executing out of state arrest warrants, aggravated robbery in Connecticut, and "armed robbery," as well as searches related to the specific security system used at the New Milford Store, and the amount of

time before an iPhone is "blacklisted." (GX 502-C, GX 539). The digital evidence also showed that Molina, Lauria, and Rodriguez, exchanged a link to a news article about the New Milford Robbery, which clearly depicted Lauria entering the New Milford Store. (GX 507-F).

In short, the evidence of Molina's involvement in the New Milford Robbery—especially when considered alongside the evidence of his participation in the Mahopac Robbery—was not just sufficient to survive a Rule 29 motion, but was overwhelming, particularly when viewed "in the light most favorable to the government, drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." *Pierce*, 785 F.3d at 838 (internal quotation marks omitted).

### 2.    Venue for the New Milford Robbery was Established by a Preponderance of the Evidence

The defendant argues "there was no evidence" that any acts in furtherance of Counts One, Two, and Three occurred in the Southern District of New York. (Mot. at 9). This argument is without merit.

"The venue requirement, despite its constitutional pedigree, is *not* an element of a crime so as to require proof beyond a reasonable doubt; rather, venue need be proved only by a preponderance of the evidence." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007) (quotations omitted). With respect to a conspiracy, venue is proper in "any district in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a). The Second Circuit has held "that venue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." *United States v. Rommy*, 506 F.3d 108, 119 (2d Cir. 2007).

Here, Agent Sabric testified that on the date of the New Milford Robbery, the 2017 Molina Phone, the Lauria Phone, and the Rodriguez Phone all traveled from the Southern District of New York, to New Milford, Connecticut, hours before the robbery, and back to the Southern District of New York, specifically, to Yonkers, New York, hours after the robbery.  (Tr. 346, 349, 353; GX 1530).  Agent Sabric explained that his conclusion about the phones' path of travel was supported by cell site records for the Lauria Phone and the Rodriguez Phone, and billing records for the 2017 Molina Phone indicating the originating city and state of cell sites used by the 2017 Molina Phone. (Tr. 331).  In addition, the parties stipulated that Molina resided in Yonkers, New York, and that his co-conspirators were arrested in Yonkers, New York.  (GX 1002, GX 1013).  Other pieces of evidence, including records from T-Mobile, Sprint, AT&T, Apple, and the New York State Department of Motor Vehicles also tied the defendant and his co-conspirators to Yonkers, New York.  (GX 301, GX 330, GX 360, GX 401, GX 501, GX 1005).  Thus, as to Count One, a rational trier of fact could easily draw the inference that the robbery conspiracy was initiated and completed in the Southern District of New York, and that on August 10, 2017, each member of the conspiracy traveled from the Southern District of New York for the purpose of committing the New Milford Robbery.

The defendant argues that the occurrence of an overt act in the district of venue must be "reasonably foreseeable" to the defendant.  (Mot. at 8). Because the evidence supported the conclusion that the co-conspirators traveled in concert from Westchester to New Milford before the robbery, and back to Westchester afterward, the jury's determination that venue was appropriate in the Southern District of New York was practically inevitable, and certainly reasonable.

The defendant's citations to *United States v. Rommy* (Mot. at 8), and *United States v. Davis*, 689 F. 3d 179 (2d Cir. 2012) (Mot. at 10), miss the evidentiary significance of the cellphone location records. If the robbery conspiracy was formed in the Southern District of New York, and commenced from the Southern District of New York, and if after the robbery, the robbers returned to the Southern District of New York, then it was not just "reasonably foreseeable" but patently obvious to Molina that an overt act in furtherance of the robbery occurred in the Southern District of New York. He and his coconspirators traveled together from this District for the purpose of committing the robbery, and returned to this District afterward. *See United States v. Davis*, 689 F.3d at 187 ("venue will lie in any district where a substantial step toward robbery took place").

With respect to substantive Hobbs Act robbery, venue is proper "in any district where interstate commerce is affected or where the alleged acts took place." *United States v. Jianjun Liu*, 515 F. App'x 49, 51 (2d Cir. 2013) (citation omitted). Further, "only a *de minimis* showing is necessary to establish the interstate nexus required for Hobbs Act jurisdiction." *United States v. Silverio*, 335 F.3d 183, 186 (2d Cir. 2003).

At trial, Marcelino Wright and John Stevens testified that in August 2017, the New Milford Store sold Apple products manufactured in China. (Tr. 201, 215). Thus, the jury could reasonably find the New Milford Robbery had an actual affect on interstate commerce. *See*, *e.g.*, *United States v. Elias*, 285 F.3d 183, 189 (2d Cir. 2002) (sufficient to show the robbed grocery store sold goods produced outside of New York state).

John Stevens further testified that the New Milford Store served customers residing in the Southern District of New York, and pooled operational resources, including inventory and staff, with three Cellular Sales stores located in the Southern District of New York. (Tr. 215-218; GX

230).   Stevens's testimony established the New Milford Robbery affected commerce in the Southern District of New York.  Thus, there was sufficient basis for the jury to conclude venue was appropriate in the Southern District of New York for the substantive Hobbs Act robbery charged in Count Two.  *See United States v. Jianjun Liu*, 515 F. App'x at 51 (2d Cir. 2013) ("testimony explaining the bus company's customer base and ticket sales in the Eastern District of New York [] sufficient for the District Court to find that the conduct with which Liu was charged affected interstate commerce in that district"); *United States v. McIntosh*, 11 Cr. 500, 2014 WL 199515, at *6 (S.D.N.Y. Jan. 17, 2014) ("it would be reasonable for a jury to infer that by robbing Rizzatti [in Nassau County, New York] of a significant sum of cash accumulated in part from his ice cream business, defendant caused at least a 'very slight effect on' Rizzatti's economic ability to purchase ice cream from the Bronx distributor in the same quantities as before" (citation omitted)); *United States v. Acosta*, 595 F. Supp. 2d 282, 290 (S.D.N.Y. 2009) ("the Government presented sufficient evidence for a rational trier of fact to conclude, by a preponderance of the evidence, that the robbery of the prepaid telephone calling cards in Queens had the requisite 'very slight,' 'minimal,' or 'potential' effect on interstate commerce in this District").

Finally, as the defendant concedes (Mot. at 9), because venue is proper as to the Hobbs Act robbery charged in Count Two, venue is also proper as to the accompanying firearms offense charged in Count Three. *See United States v. Rodriguez–Moreno*, 526 U.S. 275, 282 (1999) ("Where venue is appropriate for the underlying crime of violence, so too it is for the § 924(c)(1) offense.").

### 3.    There was Ample Evidence to Support the Jury Verdict on the Firearms Offenses

The defendant argues there "was no proof in the form of competent witness testimony . . . or expert testimony that the objects utilized were actual firearms" (Mot. at 12), thus the jury could not conclude beyond a reasonable doubt that the weapon used in either robbery was "in fact a real firearm." (Mot. at 14).  This argument is factually and legally inaccurate.

As an initial matter, the victim witnesses, Christopher Sielawa, Marcelino Wright, and Troy Consalvo each testified that the first robber to entire their respective stores pointed a "gun." (Tr. 38, 206, 389).  With respect to the Mahopac Robbery, Christopher Sielawa also testified that the robber with the gun threatened to "pistol whip" him.  (Tr. 44).  Further, Sergeant Russo testified that he has carried a service weapon for approximately twenty years, and receives firearms training three times each year. (Tr. 71). Sergeant Russo reviewed the surveillance video from the Mahopac Robbery, and identified the robber performing a gesture he viewed as consistent with loading a firearm.  (Tr. 76-77; GX 104-H).

With respect to the New Milford Robbery, Detective Guilbeault testified that he reviewed the surveillance video, and identified the robber performing a gesture he viewed as consistent with racking the chamber of a firearm.   (Tr. 231; GX 210).   The defendant emphasizes that Troy Consalvo thought the gun "sounded plastic" (Mot. at 13), but Detective Guilbeault testified that his own service gun is made in part from plastic.  (Tr. 249). Thus, if he were to rack his service pistol, it would sound like "steel sliding on plastic."  (Tr. 245).

Moreover, the defendant testified that he had access to multiple real firearms in 2017, 2018, and 2019—describing them in detail—and exchanged a text message with co-conspirator Anthony

Lauria about purchasing and possessing a real firearm the day after the Mahopac Robbery. (Tr. 437-438, 446-449, 465-466; GX 503-C, GX 505-B, GX 510, GX 532; DX D, DX F).

The Second Circuit has held that in cases where "a gun is not recovered, eyewitness testimony may be sufficient for the government to meet its burden of proof under § 921(a)(3), so long as it provides a rational basis for the jury to find that the object observed by eyewitnesses 'was, in fact, a firearm.'" *United States v. Jones*, 16 F.3d 487, 490 (2d Cir. 1994); *see also United States v. Brown*, 784 F. App'x 1, 4 (2d Cir. 2019) ("Brown contends that the Rite-Aid manager's testimony that the robber brandished a 'black gun' was insufficient to establish that the robber possessed a real firearm.... [T]he mere possibility that a firearm observed by a witness could be a sophisticated toy or other facsimile does not necessarily create a reasonable doubt, nor is the government required to disprove that theoretical possibility. Rather, it is for the jury to weigh the evidence and determine whether the government met its burden of demonstrating that Brown possessed a firearm." (internal quotation marks and citations omitted)); *United States v. Steele*, 390 F. App'x 6, 10-11 (2d Cir. 2010) ("Ballard asserts that the evidence before the jury, testimony that the victims claimed the robbers had 'guns,' is insufficient as far as proving that the robbers had 'firearms,' as so defined by Title 18. The facts in the instant case are on all fours with our precedent, and we therefore reject Ballard's contention as to the sufficiency of the evidence." (internal quotation marks and citations omitted)).

Here, three victims testified the robbers had a "gun," law enforcement officers testified that during each robbery the robbers used a firearm in a manner consistent with the use of a real firearm, and the defendant himself acknowledged that he used and possessed firearms, both for illicit purposes, and in common with his co-conspirator Anthony Lauria. In view of this evidence, it was

27

perfectly reasonably for the jury to find the object displayed during the course of each robbery was in fact a real firearm.

## IV.    This Court Should Deny Molina's Rule 33 Motion

The defendant asserts the "Court should order a new trial pursuant to Rule 33, because the proof at trial was so sparse that the interests of justice require such a result." (Mot. at 15).  To support his motion for a new trial, the defendant relies on the arguments made in support of his motion for a judgment of acquittal.  The Court should reject those arguments.

Federal Rule of Criminal Procedure 33 states that "the court may grant a new trial to [a] defendant if the interests of justice so require."  Fed. R. Crim. P. 33.  Trial courts "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir. 1982).  "It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992).  As the Second Circuit explained in *Sanchez*:

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?" In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required. *There must be a real concern that an innocent person may have been convicted.*

*Id.* (emphasis added).  The Court "must exercise the Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'"  *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (internal quotation marks omitted).

28

As in the context of a Rule 29 motion, a "defendant challenging the sufficiency of the evidence bears a very heavy burden, because the reviewing court is required to draw all permissible inferences in favor of the government and resolve all issues of credibility in favor of the jury verdict." *United States* v. *Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011); *see also United States* v. *Heras*, 609 F.3d 101, 105 (2d Cir. 2010); *United States* v. *James*, 239 F.3d 120, 124 (2d Cir. 2000) ("[T]he credibility of witnesses is the province of the jury and [this Court] simply cannot replace the jury's credibility determinations with [its] own." (citation and internal quotation marks omitted)).  The Court must analyze the pieces of evidence "'in conjunction, not in isolation,'" *United States* v. *Persico*, 645 F.3d at 104 (quoting *United States* v. *Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008)), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *United States* v. *Guadagna*, 183 F.3d at 130; *Persico*, 645 F.3d at 104 (citing *Guadagna*).

Molina does not identify exceptional circumstances to warrant intruding on the jury's function.  Instead, he challenges the sufficiency of the evidence. (Mot. at 15). In short, Molina's argument—which was already rejected by the jury—cuts against virtually every standard for this Court's consideration of a sufficiency challenge, asking this Court to disregard evidence, conclude that the testimony of all witnesses except for Molina was not credible, consider each piece of evidence in isolation rather than in context, and draw all inferences in favor of Molina himself. When the evidence is properly considered, it is not sparse, or even merely sufficient.  The evidence amply supports the jury's verdict, and there is no basis on which to order a new trial.

29

V.    **Conclusion**

For the foregoing reasons, the Court should deny the Motion.

Dated:  White Plains, New York
        August 27, 2021

<div style="margin-left:50%">

Respectfully submitted,
AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:    _____
       Lindsey Keenan
       Shiva Logarajah
       Assistant United States Attorneys
       (2120 637-1565 / (914) 993-1918

</div>

30